# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### December 2, 2008 Session

## STATE OF TENNESSEE v. QUINTON SANDERS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 00-04327      Joseph B. Dailey, Judge**

---

**No. W2006-00760-CCA-R3-CD  - Filed May 20, 2009**

---

The defendant, Quinton Sanders, was convicted by a Shelby County jury of murder in the perpetration of a felony.  For his conviction, the defendant was sentenced to life in the Tennessee Department of Correction.  On appeal, the defendant raises the following issues:  (1) whether the trial court erred in denying a motion to exclude evidence of the defendant's gang affiliation; (2) whether the trial court properly found that a prima facie case of purposeful discrimination by the state in the exercise of peremptory challenges had not been established; and (3) whether the trial court erred in denying a motion to grant a mistrial.  After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Cornelius Bostick (on appeal), Memphis, Tennessee, and John Herbison (at trial), Nashville, Tennessee, for the appellant, Quinton Sanders.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Amy Weirich and Greg Gilbert, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

Background
        Upon appellate review of the defendant's previous trial, the defendant's convictions for theft of a Chevrolet Malibu and attempted theft of clothing valued at $5,200 were affirmed, but the case was remanded for a second trial on the charge of murder during the perpetration of a felony for the killing of Don Overton, an officer with the Memphis Police Department.  *See State v. Quinton Sanders*, No. W2001-01927-CCA-R3-CD, 2004 WL 221217 (Tenn. Crim. App., at Jackson, Jan. 30, 2004), *perm. app. denied* (Tenn. June 14, 2004).  The trial court was instructed that on remand, the charge to the jury should include the lesser-included offenses of second degree murder, reckless

homicide, and criminally negligent homicide. *Id.* at *3-4. A second jury trial was conducted on the charge of murder in the perpetration of a felony. During the selection of the jury, the defendant objected to the state's use of peremptory challenges, arguing that the use of the challenges by the state demonstrated purposeful discrimination against African American members of the venire. The defendant requested that the trial court require the state to provide race-neutral reasons for its challenges to African American prospective jurors. The trial court declined, finding no prima facie case of purposeful discrimination. The jury was impaneled and the trial proceeded. We summarize the following testimony relevant to this appeal in an order consistent with chronological events.

Shelia Johnson testified that on October 12, 1999, she was working as a cashier in the men's department at Goldsmith's Department Store in the Raleigh Springs Mall. Ms. Johnson stated that in the early afternoon, four young men came into the men's department, stayed a short time, and left. Ms. Johnson thought the men were suspicious and alerted security of their presence in the mall. About forty minutes later, Ms. Johnson saw the four young men walking toward the store exit, each caring a stack of clothes "up to their chin." Ms. Johnson stated that "when she hollered 'Security,' they dropped [the clothes] on the floor [and] ran toward the front of the store." Ms. Johnson identified photographs of the four men, which were made exhibits at the trial.

Jeremy Lansing, who was working as a security guard at the Raleigh Springs Mall, testified that he became suspicious of four young men who entered Goldsmith's because they started to "stack some merchandise." Mr. Lansing identified the defendant as one of the four men. He explained that "stacking merchandise" would allow someone to easily "take off with" store merchandise. Because of their suspicious behavior, Mr. Lansing asked the four men to leave the mall on three separate occasions within a short period of time. Mr. Lansing testified that he then proceeded "upstairs to take care of some other business" and received a call from his supervisor reporting an attempted theft of store merchandise. Mr. Lansing assisted with the inventory of the merchandise left on the floor of Goldsmith's by the four young men. He testified that the merchandise was determined to be valued at just over $5,000. A video tape was identified by Mr. Lansing as an excerpt from an eight hour tape recorded by a security camera and showing the four men's activities at the mall. The excerpt was played for the jury and marked as an exhibit at the trial.

Vincent White testified that in connection with the events of October 12, 1999, he plead guilty to theft of property over $1,000. He stated that he met the defendant at Fairly High School when he was in the ninth grade and the defendant was in the tenth grade. According to Mr. White, in 1999, he was a member of the Vice Lords gang. The defendant was a member of the Blackstone Rangers gang and said that he wanted Mr. White to become a Blackstone member. The defendant invited Mr. White to a Blackstone meeting which was held about two weeks before the car wreck. At the meeting, the gang members were "talking about things that could support the Blackstone Nation. . . . [r]aising money, selling dope or whatever." Mr. White testified that he attended a second smaller meeting "a couple of days before the wreck." At the second meeting, money was again discussed, and Lewis Grimes, identified by Mr. White as the head of the Blackstones, "said some [money] was missing out of their treasury." Mr. White stated that he understood from Mr. Grimes that "he wanted [Mr. White and the defendant] to get the money back by any means necessary." Mr. Grimes told Mr. White and the defendant "that he wanted the money or [their] heads." Mr. White stated that he was told that about $1,500 was missing from the treasury, and that he thought he

"needed to get this money . . . . [b]ecause [he] felt threatened [and] felt [his] life was in danger." Mr. White stated that they came up with a plan to "boost some clothes," meaning they would "[g]o to the mall and steal clothes. . . . [and] sell them."

On October 12, 1999, Mr. White went to school, but left early in the defendant's green Chevrolet Malibu with the defendant, Derrick Dean, and Lorenzo Bates. He recalled that they went to the Raleigh Springs Mall with the intention of stealing clothes. Mr. White stated that he and the defendant did not discuss with Derrick Dean and Lorenzo Bates their plan that the money was going to the "Blackstone Nation." Mr. White stated that he had a gun, but left it in the Chevrolet Malibu when they went into the mall. While they were in Goldsmith's, a security guard told them to "get out [of] the store because he already knew what [they were] up to." According to Mr. White, they left the store, but returned for the clothes. After each of the four gathered a stack of clothes, they headed toward the door, but the cashier "yelled out, 'Security,' and [they] got scared and dropped the clothes." Mr. White and the other young men ran out of the mall and got into the Chevrolet Malibu with the defendant driving. Mr. White stated that he saw a police car as the defendant drove out of the mall parking lot, but the defendant "lost him, and then [the defendant] got on the expressway." Mr. White stated that as the defendant came off of the expressway a police car was behind them, and the defendant increased his speed to approximately ninety-five miles per hour. The defendant was not staying in his lane, but was switching lanes and was "going in the opposite lanes." Mr. White testified that at one point, he asked the defendant to let him out of the Malibu, but the defendant did not pull over and just "turned up the radio." As they were traveling down Hollywood Street, Mr. White remembered he had a gun and leaned over to hide the gun under the seat. Mr. White recalled "by the time [he] looked up . . . that's when [they] crashed." Mr. White stated he did not recall seeing the car they hit, nor did he remember anything after the crash.

Derrick Dean testified that he plead guilty to theft of property over $500 and theft of property over $10,000 in connection with the events of October 12, 1999. Mr. Dean stated that he left school in the morning with the defendant, Vincent White, and Lorenzo Bates to go "to the mall . . . .[to] [s]teal some clothes." According to Mr. Dean, they entered Goldsmith's and each grabbed an arm full of clothes. However, when the lady at the cash register yelled for security, they dropped the clothes and ran out of the mall to the Chevrolet Malibu in the parking lot. The defendant drove out of the mall parking lot "at a high rate of speed." As the defendant left the mall parking lot, a police car "put on the siren and got behind [them]" and the defendant "sped up." Mr. Dean asked to be let out of the Malibu, but the defendant did not stop and drove onto the interstate. The defendant drove at a normal speed on the interstate, but after he exited the interstate, the defendant sped up because police again "got behind [the Malibu]." Mr. Dean did not recall anything about the accident, "until [he] woke up in the hospital." Mr. Dean stated that his intentions were "to steal the clothes and get some money in [his] pocket."

Lorenzo Bates testified that he had a criminal record including a conviction for theft of property over $1,000 in connection with the events of October 12, 1999. On the day of the car wreck, Mr. Bates left school early with Derrick Dean, Vincent White and the defendant to "[s]teal some clothes." Mr. Bates stated that when they entered Goldsmith's, he grabbed an arm full of clothes and headed for the door. As they approached the door, a lady stood in their way, yelling for security. They all dropped the clothes and ran to the parking lot. Mr. Bates recalled that he and Mr.

Dean got into the back seat of the Chevrolet Malibu and Mr. White got in the front seat with the defendant who drove. He recalled seeing a police car get behind the Malibu as they left the mall, and also remembered that they traveled on the interstate. Mr. Bates stated that at some point, other police cars were behind the Malibu trying to make the defendant stop. Mr. Bates could not recall other details about the events surrounding the accident.

Reginald Alexander, a former officer with the Memphis Police Department, testified that he was working as a patrolman when he received a radio dispatch to investigate a burglary at the Raleigh Springs Mall. He arrived at the mall in his squad car and, as he drove past one of the entrances, Officer Alexander saw an African American man running from one of the stores. Officer Alexander stated that he drove to another mall entrance. As he was turning into the mall, a green Chevrolet Malibu occupied by four African American males exited the mall parking lot at a high rate of speed and nearly hit his car. Officer Alexander stated that he then "backed out, hit [his] blue lights - got on the radio and told the dispatcher [that he was following] a green Malibu occupied by four or five male blacks exiting the mall going down Scheibler toward Stage at a high rate of speed." However, "by the time [he] put [his] car in drive . . . [the Malibu] was gone." Officer Alexander stated that he followed in pursuit, and upon arriving at the intersection of Stage and Scheibler, bystanders at a gas station directed him to Coleman Street. At the intersection of Stage and Coleman, Officer Alexander recalled that occupants of cars stopped in the intersection directed him down Austin Peay. Officer Alexander did not see the Malibu again until he arrived at the intersection of Hollywood and Staten. At that time, he recognized one of the cars that had been involved in the wreck as the Chevrolet Malibu he had pursued from the Raleigh Springs Mall.

Elizabeth Mize, patrol officer for the Memphis Police Department, testified that she heard a radio broadcast regarding a green Chevrolet Malibu leaving the Raleigh Springs Mall. She determined that the Malibu was headed in her direction and parked her squad car at the intersection of Austin Peay and Jackson, near the interstate, to wait for the Malibu. Officer Mize stated that she spotted the Malibu traveling in excess of the speed limit on Austin Peay and proceeding onto the westbound ramp. Officer Mize stated that she immediately broadcast the location of the Malibu.

Officer Felipe Boyce, with the Memphis Police Department, testified that he was working as a patrolman and heard the radio dispatches by Officers Alexander and Mize. He stated that he proceeded to the interstate exit at Hollywood and saw a Chevrolet Malibu exit the interstate at a speed faster than the flow of traffic. Officer Boyce noticed that the Malibu fit the description given in a recent radio dispatch regarding a vehicle involved in an incident at the Raleigh Springs Mall. He requested that the dispatcher "run the tags" on the Malibu to determine if the Malibu was stolen. The dispatcher was not able to provide information on the ownership of the Malibu because "the computer was down." Officer Boyce testified that he then activated his siren and blue lights and pulled within approximately one car's length of the Malibu. He saw the occupants of the Malibu look back at him and recalled that the Malibu accelerated from forty-five to fifty-five miles per hour. Officer Boyce continued to follow the Malibu and at the next two intersections, he saw the Malibu travel into the turn lanes and around vehicles stopped at red lights. He estimated that when he last saw the Malibu, it was traveling about seventy miles per hour. Officer Boyce stated that he proceeded to the intersection of Hollywood and Staten and saw the Malibu he had followed wrecked

-4-

against a pole. Officer Boyce recalled that he also saw Officer Overton who was unconscious in a wrecked squad car.

Officer Darryl Bryant, with the Memphis Police Department, testified that he was patrolling a nearby area when he heard a radio broadcast reporting that a suspect involved in an incident at the Raleigh Springs Mall was traveling southbound on Hollywood from the interstate. Officer Bryant proceeded to the area to assist. As he was stopped at the intersection of Hollywood and Chelsea, Officer Bryant spotted a green car traveling from the north and crossing over into on-coming traffic. After the green car nearly hit his squad car, Officer Bryant followed in pursuit. He stated that he reached up to approximately seventy miles per hour while following behind the green car. Officer Bryant recalled that he looked 200 to 300 yards down Hollywood and saw the green car drive onto the curb and weave through traffic. He also recalled that people were jumping out of the path of the green car. Officer Bryant stated that he then saw a squad car pull out from Staten onto Hollywood and that the squad car was followed by a second squad car. According to Officer Bryant, the green car came from behind the two squad cars, moved into the turn lane, and drove directly into the driver's side door of the second squad car.

Tom Warrick, Officer Overton's partner on the day of the accident, testified that he and Officer Overton were completing another investigation and heard a call from Officer Alexander regarding a suspect leaving the Raleigh Springs Mall. Officer Warrick stated that they determined from subsequent dispatches that the suspect was headed in their direction and they proceeded to the area in separate squad cars. Officer Warrick approached the intersection of Staten and Hollywood in front of Officer Overton. After Officer Warrick had completed a turn from Staten onto Hollywood, he suddenly saw a green Chevrolet Malibu dart out into the turn lane in front of his vehicle and facing him. In order to avoid the Malibu, Officer Warrick turned sharply to the left and spun around. At that point, two police cars drove past him and followed the Malibu. When Officer Warrick looked up, he saw that the Malibu had hit a white car, but did not realize it was Officer Overton's car because the impact had knocked the police lights off of the squad car.

Reuben Criswell testified that he was working at his father's restaurant, Hollywood Wings and Things, when he heard the loud acceleration of a vehicle. Mr. Criswell stated that he went to investigate the noise and saw one police car that had completed a turn from Staten onto Hollywood, and a second police car that was attempting to complete the same turn. Mr. Criswell then saw another car hit the second police car. Mr. Criswell stated that he immediately looked up and saw other police cars approaching. In response to whether the video which had been made a trial exhibit accurately depicted the accident, Mr. Criswell responded "if it's the same video we saw at first trial, then yes[.]"

Lieutenant A.J. Kant, with the Memphis Police Department, testified that on October 12, 1999, he was called to an accident scene at Hollywood and Staten to secure evidence. Fire department personnel reported that while removing occupants from the wrecked vehicles, they saw a .38 caliber gun located on the floor board of one of the vehicles. He understood that the gun was untouched by the fire department personnel so that its location could be noted in his investigation. Lieutenant Kant found the gun in a location within the reach of the driver of the Chevrolet. He stated that it appeared that the gun had not been fired, but stated "one of the rounds had the hammer

from a pistol dropped onto the primer." The gun, ammunition found in the gun, and both vehicles involved in the wreck were made exhibits to the trial.[1]

Jim Wilcox, a retired Memphis Police Department officer with the traffic unit, testified that he investigated the scene of the accident. In his investigation, Officer Wilcox photographed and measured gouges and scratches in the pavement and tire marks on the pavement in the curb line. Officer Wilcox's investigation included numerous visits to the scene, review of statements, and consultation with others investigators. Based on his investigation, Officer Wilcox determined that the Chevrolet Malibu was traveling from ninety-five to one hundred and seven miles per hour at the time that it collided with the squad car. Officer Wilcox also determined that the distance between the Raleigh Springs Mall and the intersection of Hollywood and Staten was approximately seven miles. He stated that he drove from the mall to the accident scene at the speed limits posted on the date of the accident in twelve minutes. Officer Wilcox stated that he used the timed radio dispatches made by police officers on the day of the accident to determine that the same distance was traveled by the defendant in five minutes and thirteen seconds at an average speed of approximately eighty miles per hour.

Thomas Mesaris, a products liability investigator, testified that in January of 2000, he was asked by the Memphis Police Department to download data from the SDM, system diagnostic module, of a Chevrolet Malibu. Mr. Mesaris provided the Memphis Police Department with a printout from the module and he sent a copy of the print out to General Motors' engineers in Detroit, Michigan. The General Motors' engineers would interpret the data on the printout and provide a report to the Memphis Police Department.

Brian Joseph Everest, a senior manager and consultant engineer with General Motors, testified that he received an investigation printout from Mr. Mesaris that reported information on a Chevrolet Malibu involved in an accident on October 12, 1999. Mr. Everest stated that, based on information that he received from Mr. Mesaris, he determined that the change in the speed of the Chevrolet during the collision was 48.5 miles per hour. Mr. Everest classified the collision as severe.

Mark Driver testified that in October of 1999, he was a professor of mechanical engineering at Christian Brother's University and was also vice president of AVT Technical Investigations. Mr. Driver recalled that he was contacted by the Memphis Police Department and asked to perform a reconstruction of an October 12, 1999 accident between a Chevrolet Malibu and a Memphis Police Department squad car. He testified that according to his calculations, the force upon impact to the body of the driver of the squad car was the equivalent of falling a distance of eighty feet. Mr. Driver stated that he also determined that at the time of impact, the Chevrolet Malibu was traveling approximately ninety-eight miles per hour and the squad car was traveling approximately thirty-five miles per hour.

---

[1]Both the Chevrolet Malibu and the squad car were made available to the jury for inspection at a building located at the fairgrounds. Some of the witnesses gave their testimony in the building at the fairgrounds in order to facilitate the jury's viewing of the wrecked vehicles during their testimony.

Rob Beach, an accident reconstructionist with the state of Michigan, testified that in October of 1999, he was contacted by the Memphis Police Department and asked to assist with an accident investigation. He testified that using his expertise and information obtained in the investigation, he determined that at the time of the impact, the Chevrolet Malibu was traveling ninety-eight miles per hour. Mr. Beach created a three dimensional animation of the accident which was viewed by the jury.

Dr. O.C. Smith, the Shelby County Medical Examiner, testified that he performed a post-mortem medical examination of Officer Overton. His examination of Officer Overton's body revealed multiple skull fractures, a fractured jaw, a traumatic diaphragmatic hernia, a ruptured vena cava, fractures in both hip joint sockets, separation in the sacroiliac joints, multiple fractures in the pelvis and thigh bones, and a broken left ankle. Dr. Smith also noted multiple bruises and abrasions on the left side of Officer Overton's body. Dr. Smith concluded that Officer Overton died as a result of multiple injuries. In Dr. Smith's opinion, Officer Overton's injuries were consistent with his vehicle being struck by another vehicle traveling ninety-eight miles per hour. Dr. Smith stated that, based on his understanding of the circumstances, he classified the death as a homicide.

The defendant did not testify on his own behalf. After deliberation, the jury convicted the defendant of murder during the perpetration of a felony, attempted theft. The defendant has appealed.

Analysis

I. Gang Affiliation

The defendant argues that the trial court erred in denying his motion *in limine* to exclude any "evidence that [the defendant] was a member of the Blackstone Rangers Gang." He asserts that evidence of the defendant's gang affiliation was not relevant and should not have been admitted at trial. The defendant alternatively argues that any probative value of evidence of his gang affiliation was substantially outweighed by its prejudicial value.

This court has previously concluded that evidence of gang affiliation is "character evidence subject to Rule 404(b)." *State v. Orlando Crayton*, No. W2000-00213-CCA-R3-CD, 2001 WL 720612, at *3 (Tenn. Crim. App., at Jackson, June 27, 2001). Rule 404(b) of the Tennessee Rules of Evidence provides that:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person or to show action in conformity with the character trait. While evidence of a prior crime, wrong or act is not admissible to prove that a defendant had the propensity or disposition to commit the crime, it may be relevant and admissible to prove issues such as identity, motive, opportunity, or absence of mistake or accident.

Tenn. R. Evid. 404(b). A trial court's decision on an issue falling under Rule 404(b) is subject to an abuse of discretion standard. "Where the admissibility of the proffered evidence must also comply with Rule 404(b) and the trial court has followed the procedure mandated by that rule, it

appears that the same standard, abuse of discretion, would be applicable." *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997) (citing *State v. Brewer*, 932 S.W.2d 1, 24 (Tenn. Crim. App. 1996)). "Although evidence of a prior act is not admissible to prove propensity or disposition to commit a crime, it may arguably be relevant to issues such as identity, intent, motive, or rebuttal of accident or mistake." *See Crayton*, 2001 WL 20612, at *3; *see also* Tenn. R. Evid. 404, Advisory Comm'n Cmnts. Evidence of a defendant's gang affiliation may be admissible when offered as evidence of motive instead of to show character. *State v. Shakir Adams*, No. W2006-02038-CCA-R3-CD, 2008 WL 1891451, at *10 (Tenn. Crim. App., at Jackson, April 29, 2008), *perm. app. denied,* (Tenn. Oct. 27, 2008).

No culpable mental state is required for a felony murder conviction except the intent to commit the underlying felony. *See* Tenn. Code Ann. § 39-13-202(b). "[I]ntent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim." *State v. Boggs*, 995 S.W.2d 102, 105 (Tenn.1999). "Proof that such intent to commit the underlying felony existed before, or concurrent with, the act of killing is a question of fact to be decided by the jury after consideration of all the facts and circumstances." *Id.* (citing *Hall v. State*, 490 S.W.2d 495, 496 (Tenn.1973); *State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App.1993)). "In determining whether the evidence is sufficient to support a conviction of first degree murder in the perpetration of theft, a court must determine whether the killing is closely connected to the initial taking of the property in time, place, causation, and continuity of action." *State v. Pierce*, 23 S.W.3d 289, 295 (Tenn. 2000).

In the instant case, we note that the trial court complied with the procedural steps announced in Rule 404(b). In a jury-out hearing, the trial court considered the evidence at issue and denied the defendant's motion *in limine* for the exclusion of evidence of the defendant's gang affiliation, stating:

> I think that the gang activity that led to the trip to the store that led to the attempted theft that led to the high-speed chase that led to the death is all so interwoven that it is very relevant and very probative to the actions taken by these men on this day to their frame of mind with regard to what they were doing at the store and their frantic attempts to get away and the high-speed chase that ensued.
>
> . . . .
>
> . . . I think, as part and parcel of what would motivate an individual to flee that desperately and driving . . . 95/100 miles an hour down Hollywood Avenue to try and get away, all of this is part of the fabric of the case and the facts that led to this ultimate action, and so I'm not going to preclude the state from getting into that. I think that those actions related to the gang activity . . . [are] needed to. . . give a full picture to the jury of all that transpired.

We agree. The evidence was relevant to the jury's consideration of the defendant's motive in committing the attempted theft and the connection in time, place, causation and continuity between the attempted theft and the killing of Officer Overton which occurred minutes after the defendant

committed the attempted theft and while the defendant fled from police. *See Boggs*, 995 S.W.2d at 105; *and Pierce,* 23 S.W.3d at 295. The record reveals that the defendant's gang affiliation was linked with his intent and motive in committing the underlying felony and with the subsequent high speed chase which lead to Officer Overton's death. We conclude that the trial court's admission of the evidence of gang affiliation was not an abuse of discretion. The defendant is without relief on this issue.

## II. Peremptory Challenges

The defendant asserts that the trial court improperly applied *Batson v. Kentucky*, 476 U.S. 79 (1986) and argues that the trial court "erred by failing to require the state to articulate a race-neutral reason for excluding five African American jurors from the prospective jury venire."

"Peremptory challenges, along with challenges for 'cause,' are the principal tools that enable litigants to remove unfavorable jurors during the jury selection process." *United States v. Annigoni,* 96 F.3d 1132, 1137 (9th Cir.1996). "The central function of the right of peremptory challenge is to enable a litigant to remove a certain number of potential jurors who are not challengeable for cause, but in whom the litigant perceives bias or hostility." *Id.* "The function of the [peremptory] challenge is not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise." *Swain v. Alabama*, 380 U.S. 202, 219 (1965), *overruled on other grounds*, *Batson*, 476 U.S. 79.

However, under the Equal Protection Clause of the Fourteenth Amendment, neither the state prosecutor nor the defendant may exercise a peremptory challenge to remove a prospective juror solely on the basis of race. *Batson,* 476 U.S. at 89-90; *see also Georgia v. McCollum*, 505 U.S. 42, 59 (1992). In *Batson v. Kentucky*, the United States Supreme Court established a three-step process for evaluating alleged discrimination in jury selection. First, the opponent of the peremptory challenge must establish a prima facie case of purposeful discrimination "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 93-94; *see also Johnson v. California*, 545 U.S. 162 (2005). Second, if the trial court determines that a prima facia showing has been made, the burden shifts to the proponent of the peremptory challenge to articulate a race-neutral explanation for the challenge. *Batson*, 476 U.S. at 97-98. The race-neutral explanation need not be persuasive or even plausible. *Purkett v. Elem*, 514 U.S. 765, 768 (1995). Unless purposeful discrimination is inherent in the explanation, the reason offered will be deemed race neutral. *See id.* Finally, if the proponent provides a race-neutral explanation, the trial court must then determine, from all the circumstances, whether the explanation is a pretext and whether the opponent of the peremptory challenge established purposeful discrimination. *See Batson*, 476 U.S. at 98; *see also Miller-El v. Dretke,* 545 U.S. 231 (2005). If the trial court determines that the proffered reason is merely pretextual and that a racial motive is in fact behind the challenge, the juror may not be excluded. *See State v. Hugueley*, 185 S.W.3d 356, 369 (Tenn. 2006); *Woodson v. Porter Brown Limestone Co., Inc.,* 916 S.W.2d 896, 903 (Tenn.1996).

When determining the existence of a *Batson* violation, the trial court must meticulously and carefully articulate specific reasons for each finding on the record, "i.e., whether a prima facie case has been established; whether a neutral explanation has been given; and whether the totality of the

circumstances support a finding of purposeful discrimination." *Woodson*, 916 S.W.2d at 906. On appeal, the trial court's findings are to be accorded great deference and not set aside unless clearly erroneous." *Id.*

The record indicates that during the selection of the jury, defense counsel requested that the court require the state to provide race-neutral reasons for its challenges and the court responded:

> I think it's premature to require any race-neutral reason to be articulated by either side. For the record, each side has eight challenges, and the defense has exercised two, both against Caucasians but has passed on the second round, which is a factor to be considered – was willing to accept the jury as constituted in the second round. The state has exercised four– one against a Caucasian and three against African Americans which . . . I don't think would cross that threshold of necessitating the articulating of a race-neutral reason.

After the state exercised two more peremptory challenges, the defense counsel again objected to the state's use of its peremptory challenges. The trial court noted that the state had used six of its eight challenges, one against a Caucasian and five against African Americans. The court further noted that the state "also had two rounds - prior to the final round - two rounds where they passed." The trial court explained that the passes showed the state was willing to accept the jury. The court noted that the defendant had exercised four of his eight challenges "three against Caucasians and one against [an] African American; and likewise had two rounds in which they passed." The court held that, as to both the state and the defendant, there was not sufficient evidence of a discriminatory pattern to "necessitate articulating race-neutral reasons." The trial court also stated:

> I think we had a jury pool of 65 or 70 jurors in which the breakdown was pretty even between Caucasian and African American, and that's reflected in the ultimate jury that we now have . . . .
>
> . . . I think it was a fair selection process, and we wound up with a fair and very representative jury, all of whom indicated a willingness to be open-minded and fair in their services as jurors in this case, so I don't see any *Batson* problems, whatsoever.

Upon review, we initially note that the record before us does not contain the peremptory challenge sheets submitted by either the state or the defendant. The transcript contained in the record before us does not clearly indicate which party was responsible for the elimination of which member of the venire. Additionally, although the defendant moved that the record on appeal be supplemented with information regarding the race and gender of the prospective jurors, that information is not contained in the record. Instead, the record contains an affidavit by William R. Key, Clerk of the Criminal Court of the 30th Judicial Circuit at Memphis, certifying that "the requested supplemental record with 'race and gender information of the venire at the time of the second *Batson* objection' is not to be found in the transcript of the record." With the exception of reference in the transcript by the trial court to the race of Dr. Thomas, a Caucasian juror challenged by the state, we are unable to determine with certainty the race of any member of the venire.

-10-

It is the appellant's duty to ensure that the record on appeal contains all of the evidence relevant to those issues which form the basis of the appeal. *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). "Where the record is incomplete and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which the party relies," this court cannot consider the merits of that issue. *Id.* at 560-61; *see* Tenn. R. App. P. 24(b). In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence and correct. *State v. Draper*, 800 S.W.2d 489, 493 (Tenn. Crim. App.1990); *and State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App.1991).

Due to the limited record, we are not able to review a number of facts relevant to the state's exercise of its peremptory challenges including which party challenged which juror and the race of members of the venire. As the record is incomplete, we are bound to presume that the trial court was correct in its ruling that the defendant failed to establish a prima facie case of purposeful discrimination. *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App.1991).

Moreover, the trial transcript reveals that during *void dire*, the state and defense counsel questioned prospective jurors throughly on matters related to the facts of this case. The jurors were asked to provide information regarding their exposure to the publicity surrounding this case, their personal knowledge or familiarity with Officer Overton and his family, and their personal history surrounding crime, law enforcement and automobile accidents. A total of ten prospective jurors were excused due to the exercise of peremptory challenges. Of those ten excused, four had indicated a knowledge of the case or knowledge of Officer Overton and his family. One challenged juror had prior knowledge of the case and had also been a victim of a carjacking. Three challenged jurors stated that they had been involved in automobile accidents and one challenged juror stated that he was involved in an accident resulting from a car race in which he was a participant. One challenged juror stated that she did not want to serve and another challenged juror stated that his daughter worked in law enforcement dispatch. A review of the available record supports the trial court's finding that evidence was insufficient to support a finding of purposeful discrimination by the state. Accordingly, after review of the available facts present in the record, we see no clear indication that the trial court erroneously applied *Batson* in this case. The defendant is without relief on this issue.

### III. Mistrial

The defendant asserts that the trial court erred in failing to grant a mistrial after Mr. Criswell, who was present at the scene of the accident in which Officer Overton was killed, referred to the video at "the first trial" during his testimony. The defendant asserts that the statement was in contravention of an order excluding any reference to the defendant's prior trial. The objectionable statement took place as follows:

[The State]:          You looked at a video visualization, didn't you?

[Mr. Criswell]:       Yes, ma'am.

[The State]:          Does that video accurately show what you saw that day?

[Mr. Criswell]: Do we have time to see it again as for as - but I'm pretty sure it does, yes, ma'am. I don't want to perjure or lie to anybody, but if it's the same video we saw at the first trial, then, yes, ma'am, that's accurate.

During a subsequent jury-out proceeding, defense counsel requested a mistrial and the trial court denied the motion.

[Defense Counsel]: I wanted to address a matter - - this is the first opportunity I've had with the jury out, and I did not want to - when the event occurred, I didn't want to emphasize it by approaching the bench at that time. The witness, Mr. Criswell, referred to the first trial, and I don't, at all suggest, that the state meant to elicit that. Even though it may have been inadvertent, I would respectfully, at this time, move for a mistrial.

The Court: Well, I think great lengths have been [made] . . . to avoid referring to the previous trial as a trial, and . . . to refer to it as a previous hearing . . . I just don't think that it's so prejudicial as to necessitate a mistrial . . . . [T]he testimony went on, and certainly the jury has been aware, all week long, that there was a previous . . . hearing . . . since it was just that one time and it was inadvertent and it wasn't repeated, I don't see any real prejudice to [the defendant], so I'll deny your motion for a mistrial.

The decision of whether or not to grant a mistrial rests within the sound discretion of the trial court. *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). The purpose of a mistrial is to correct the damage done to the judicial process when some event has occurred which would preclude an impartial verdict. *See Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). Normally, a mistrial should be declared only if there is a manifest necessity for such action. *Id.* A manifest necessity exists when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). The defendant bears the burden of establishing a manifest necessity. *State v. Seay*, 945 S.W.2d 755, 764 (Tenn. Crim. App. 1996). This court will not disturb the trial court's decision unless there is an abuse of discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990). When determining whether a mistrial is necessary because inappropriate testimony was presented to the jury, this court considers the following non-exclusive factors: "(1) whether the state elicited the testimony; (2) whether the trial court gave a curative instruction; and (3) the relative strength or weakness of the state's proof." *State v. Lawrence Taylor*, No. W2002-00183-CCA-R3-CD, 2003 WL 402276, at *4 (Tenn. Crim. App., at Jackson, Feb. 14, 2003).

In the instant case, the record reflects that pursuant to a consent order, Mr. Criswell's testimony referring to the first trial was inadmissible. However, upon consideration of factors previously enumerated by this court, we conclude that a mistrial was not necessary. *See id.* In the

-12-

first place, and acknowledged by the defense counsel at trial, reference to the first trial does not appear to have been elicited by the state. The prosecutor confirmed that the witness had viewed the video, and then asked "[d]oes that video accurately show what you saw that day?" The reference to "the first trial" by Mr. Criswell appears to be an unexpected qualification to his answer and not elicited by the prosecutor's inquiry regarding the video's accuracy. Therefore, the first consideration, whether the state elicited the objectionable testimony, weighs in favor of the trial court's denial of a mistrial. Secondly, although the record reflects the trial court did not provide a curative instruction, we note that no such instruction was requested. To the contrary, the defense counsel did not make a contemporaneous objection to the statement by Mr. Criswell, but waited to address the court on the matter in a bench conference during the testimony of a subsequent witness. Defense counsel explained the delay in addressing the court stating he wanted to avoid "emphasize it by approaching the bench at that time." The jury was aware of a previous court proceeding involving the defendant and reference to "a previous hearing" was admissible. In addressing the jury in his opening statement, defense counsel referred to the criminal history of the defendant, telling the jury that the evidence would show that the defendant had been convicted of attempt to commit a theft. In considering whether a curative instruction to the jury was necessary, we agree with defense counsel's logic that further mention of the first trial would only draw further attention to the fact that there was a previous trial, but also agree with the trial court's finding that the information was not "so prejudicial as to necessitate a mistrial." We conclude that the trial court did not abuse its discretion in denying the defendant's request for a mistrial.

### Conclusion

Based on the foregoing review, we affirm the judgment of the trial court.

_____
J.C. McLIN, JUDGE